UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

ERIC JENKINS,

Petitioner,

- versus -

CATHERINE COOK,

Respondent.

MEMORANDUM
AND ORDER
08-cv-2006 (JG)

A P P E A R A N C E S

POLSINELLI PC
900 Third Avenue, 21st Floor
New York, New York 10022
By:      Ronald Marc Daignault
         *Attorneys for Petitioner*

RICHARD A. BROWN
Queens County District Attorney's Office
125-01 Queens Boulevard
Kew Gardens, New York 11415
By:      Ushir Pandit
         *Attorney for Respondent*

JOHN GLEESON, United States District Judge:

Eric Jenkins petitions under 28 U.S.C. § 2254 for a writ of habeas corpus, seeking relief from a state court judgment convicting him of murder in the second degree and criminal possession of a weapon in the second degree. He argues that he was denied his federal constitutional rights over the course of his four trials in state court. I heard argument on the motion on August 14, 2014. For the reasons given below, neither a writ nor a certificate of appealability shall issue.

BACKGROUND

A.      *The Offense Conduct and Indictment*

At approximately 8:45 p.m. on April 11, 1992, Michael Reese was fatally shot while standing at a bus stop shelter on Guy R. Brewer Boulevard in Jamaica, Queens. Reese sustained one gunshot wound to his back and two to the back of his head. He was pronounced dead at the scene. During the ensuing investigation, the police questioned Garvey Napoleon, who later testified that he was an eyewitness to the shooting. After being shown a single photograph of petitioner Eric Jenkins, Napoleon identified Jenkins as the shooter. On May 12, 1992, the police arrested Jenkins and charged him with murder of Reese.

Napoleon testified in the Grand Jury that he saw Jenkins shoot Reese, and further that he recognized Jenkins from seeing him in Brooklyn prior to the shooting. Another witness, David Morgan, testified that he had heard Jenkins threaten to kill Reese the day before the murder because Reese had beaten Cecil Saddler, Jr., Jenkins's nephew. The grand jury charged Jenkins with two counts of murder in the second degree, N.Y. Penal Law § 125.25, one count of criminal possession of a weapon in the second degree, N.Y. Penal Law § 265.03, and one count of criminal possession of a weapon in the third degree, N.Y. Penal Law § 265.02.

B.      *The Motion to Suppress and the First Trial*

Jenkins moved to suppress Napoleon's in-court identification. He contended that the single-photo show up was unnecessarily suggestive, and that there was insufficient evidence to show that Napoleon was previously acquainted with Jenkins, rendering the procedure improper and the identification unreliable. At the close of the hearing on March 1, 1993, the court denied Jenkins's motion.

2

The first trial began on May 5, 1993. On May 12, the trial court declared a mistrial based on prosecutorial misconduct after finding that the prosecutor had failed to disclose that the State had entered into a cooperation agreement with Morgan, who was the State's key motive witness.

C.    *The Second Trial, Subsequent Appeals and the Successful Petition for a Writ of Habeas Corpus*

The second trial began on September 22, 1993. A new prosecutor appeared for the State, and at the outset of the trial she acknowledged on the record that the State had entered into an agreement with Morgan and further stated that she expected that information to come out during her direct examination of Morgan.

However, during the direct examination, the prosecutor never asked Morgan about the cooperation agreement and the information did not otherwise come out. On cross-examination, when asked by defense counsel about his plea agreement with the State, Morgan initially denied its existence. When defense counsel then confronted Morgan with his testimony from the first trial acknowledging the existence of an agreement, he admitted that he had made a deal for a reduced sentence. He did not explain that his deal with the State was contingent upon his testifying against Jenkins. On redirect examination, the prosecutor asked Morgan if he had ever met with her before or made any agreement with her; he responded in the negative to both questions. He did not explain that he had met with the *first* prosecutor assigned to the case to arrive at his cooperation agreement. During her summation, the prosecutor argued to the jury that Morgan had no reason to lie: he "[n]ever met me before he testified, never made any deal with me."

The jury convicted Jenkins of one count of murder in the second degree and one count of criminal possession of a weapon in the second degree. On October 27, 1993, Jenkins

was sentenced to concurrent prison terms of fifteen years to life on the murder count and three to nine years on the weapons-possession count.

On August 12, 1996, the Appellate Division, Second Department affirmed Jenkins's conviction. *People v. Jenkins*, 230 A.D.2d 806 (2d Dep't 1996). It found that the single-photo identification procedure by which Napoleon first identified Jenkins as the shooter was permissible because "[u]nder the facts presented, the identification of the defendant was merely confirmatory." *Id.* at 807. It dismissed Jenkins's other claims, including his claim of prosecutorial misconduct, finding them to be without merit. *Id.* A judge of the New York State Court of Appeals denied Jenkins leave to appeal the conviction on October 15, 1996. *People v. Jenkins*, 88 N.Y.2d 1069 (1996) (Smith, J.). The Appellate Division later dismissed Jenkins's petition for a writ of error *coram nobis*, in which he claimed that he had received ineffective assistance of counsel. *People v. Jenkins*, 665 N.Y.S.2d 583 (2d Dep't 1997).

On January 8, 1998, Jenkins, proceeding *pro se*, filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. He asserted, *inter alia*, that (1) Napoleon's in-court identification was tainted by the impermissibly suggestive single-photo identification procedure, and (2) the prosecutor's failure to correct Morgan's false testimony about his cooperation agreement and her reinforcement of that false testimony constituted prosecutorial misconduct.

Judge Nina Gershon granted the petition for habeas relief on the basis of prosecutorial misconduct, finding that the prosecutor had failed to correct Morgan's omission of the fact that his testimony was required under his cooperation agreement and then "capitalized upon the omission both on redirect examination and in her summation." *Jenkins v. Artuz*, No. 98-cv-277, at *28 (E.D.N.Y. May 16, 2001). The court found that "[t]he combined effect of these actions was to leave the jury with the mistaken impression that Mr. Morgan had no

cooperation agreement with the State and, thus, that there was no reason to doubt his credibility." *Id.*

Judge Gershon dismissed Jenkins's claim that Napoleon's in-court identification should have been suppressed, stating that "the totality of the circumstances show that his identification of petitioner was based on []his prior familiarity and not the single photograph shown to him by police." *Id.* at *23.

The Second Circuit affirmed, holding that "the writ should issue because the Appellate Division's denial of Jenkins's federal due process claim relating to the use of false testimony against him was an unreasonable application of clearly established federal law as determined by the Supreme Court of the United States." *Jenkins v. Artuz*, 294 F.3d 284, 286-87 (2d Cir. 2002).

D.       *The Identification Hearing and Third Trial*

In 2002, as the parties were preparing for a third trial, Napoleon informed the prosecutor that he had falsely testified at the grand jury proceeding ten years earlier and at Jenkins's first two trials after being pressured to do so by the original case detective. Napoleon reported that after he identified Jenkins based on a single photograph shown to him by the police detective, the detective told him that it would be better if he testified that he had known Jenkins prior to the shooting. Napoleon admitted that, in fact, he did not know Jenkins from before the shooting. However, he reaffirmed all of the remainder of his testimony.

The prosecutor informed the court and defense counsel of Napoleon's false testimony. Defense counsel moved to inspect the grand jury minutes and to dismiss the indictment. On May 8, 2003, the court denied the motion to dismiss the indictment. Defense counsel then moved to suppress Napoleon's in-court identification of Jenkins, alleging that the

single-photo identification procedure used by the detective was unnecessarily suggestive and that there was no independent basis for the reliability of the identification now that it was known that Napoleon was not previously acquainted with Jenkins.

The court conducted a hearing on October 22, 2002. At the hearing, Napoleon was questioned by the prosecutor, defense counsel, and occasionally by the court about his recollection of the shooting. He answered questions about the scene of the shooting, his location and ability to observe the shooting (*e.g.*, the lighting conditions, whether his view was obstructed, his distance from the shooting), his knowledge of those involved, what he in fact observed, and his false testimony at prior proceedings. The court then heard argument from counsel regarding whether or not Napoleon had a sufficient opportunity to observe the shooting and the shooter to form an independent recollection of the event. The court concluded that the State had shown by clear and convincing evidence that Napoleon possessed an independent source for his in-court identification of Jenkins. The court found:

> The witness had an unobstructed view of the defendant as the defendant walked toward the victim, as he shot the victim, and as he ran from the scene of the homicide. The witness was able to make his observations of the defendant in an area that was well lit from several different sources and the witness was a reasonable distance away from the defendant. The witness also testified that the defendant was facing in his direction and that he could see the defendant's face without any obstructions blocking his view.

Pet.'s Memo. of Law, Ex. 2 at 4 (citation omitted), ECF No. 20-3 at 40. The court therefore denied Jenkins's motion to suppress Napoleon's in-court identification.

Jenkins's third trial commenced on January 7, 2003 and ended on January 17, 2003, when the court declared a mistrial due to a hung jury.[1]

---

[1] Before the close of the third trial, defense counsel indicated on the record that although Jenkins would be willing to plead guilty pursuant to *North Carolina v. Alford*, 400 U.S. 25 (1970), he refused to plead guilty to first-degree manslaughter in exchange for a sentence of time served because he "w[ould] not allocute to a murder

On March 4, 2003, Jenkins moved to reopen the October 22, 2002 identification hearing, alleging ineffective assistance of counsel. The motion was denied.

E.    *The Motion to Present Expert Testimony, Fourth Trial and Direct Appeal*

On April 9, 2003, Jenkins filed a motion for leave to call an expert witness regarding eyewitness identification. The trial court denied the motion, finding:

> The Court, having already participated in a trial of this matter, and in a position to weigh the request against other relevant factors, is aware that other evidence exists linking the defendant to this crime. This Court is also aware that an "independent source" hearing has been held where the circumstances under which the eyewitness observed the defendant were fully explored and found to be sound. Accordingly, the Court chooses not to exercise its discretion to permit an "identification expert" to testify.

Pet.'s Memo. of Law, Ex. 5 (citation omitted).

The fourth trial began on October 21, 2003. Napoleon and Morgan testified for the State, as did two witnesses who had first testified at the third trial: Jerry Payne and Sean Gibson. Payne and Gibson both testified that they witnessed the fight involving Reese and Jenkins's nephew and also, alongside Morgan, saw Jenkins that evening. They testified that Jenkins asked about Reese and threatened retribution against him. Gibson, who was friends with Reese and also dating Jenkins's niece, testified that after the shooting, Jenkins asked him over the phone to tell everyone that he had not killed Reese. Pet.'s Memo. of Law, Ex. A at A3635 (Fourth Trial Tr. at 642). Gibson's testimony continued: "I said but you did. He said but I need you to tell everybody I didn't." *Id.* Gibson testified that sometime later Jenkins "said he didn't mean to shoot Michael in the head. He was going to shoot him in the leg but Michael turned to run." *Id.*

---

that he did not do." Jenkins had at that time been incarcerated since his May 12, 1992 arrest. Pet.'s Memo. of Law at 9-10, Ex. A at A4494-95 (Third Trial Tr. at 778:16-779:16). Jenkins asserts that he again turned down an offer to plead guilty to manslaughter in exchange for time served after the close of the third trial, maintaining his innocence. *Id.* at 15.

The jury found Jenkins guilty of murder in the second degree and criminal possession of a weapon in the second degree. Jenkins was sentenced to indeterminate terms of imprisonment of 25 years to life on the conviction of murder in the second degree and 5 to 15 years on the conviction of criminal possession of a weapon in the second degree, to run concurrently with each other.

In May 2006, Jenkins appealed his judgment of conviction. On March 6, 2007, the Second Department modified the judgment by reducing the sentence imposed on the murder conviction to an indeterminate term of imprisonment of fifteen years to life and the sentence imposed on the criminal-possession-of-a-weapon conviction to an indeterminate term of imprisonment of three to nine years, as had been imposed after the second trial. The court otherwise affirmed the decision. It specifically found that there was clear and convincing evidence proving that Napoleon identified Jenkins in court based on independent observations from the shooting and also that the court properly denied Jenkins's motion to call an expert witness on eyewitness identification. *See People v. Jenkins*, 38 A.D.3d 566, 567 (2d Dep't 2007). A judge of the Court of Appeals denied leave to appeal on May 31, 2007. *People v. Jenkins*, 8 N.Y.3d 986 (2007) (Jones, J.).

F.       *The Instant Habeas Petition, § 440 Motion and First § 440 Hearing*

On May 16, 2008, Jenkins filed this petition for a writ of habeas corpus. On August 1, 2008, I granted a stay of the petition to allow Jenkins to file a motion under N.Y. Crim. Proc. Law § 440.10, to pursue an unexhausted claim in state court. Jenkins thereafter moved in that court to vacate his judgment of conviction, alleging, *inter alia*, that the trial court abused its discretion and denied Jenkins due process by barring Jenkins's eyewitness-identification expert from testifying. On September 19, 2008, he filed a supplemental

memorandum of law in support of his § 440 motion on the grounds of newly discovered evidence. In that memorandum, Jenkins argued that both Napoleon and Gibson had recanted past testimony in statements to private investigators retained by defense counsel. The investigators had obtained a written statement from Gibson on July 17, 2008, in which he recanted his statement that Jenkins had admitted to being the shooter. On September 14, 2008, the investigators had obtained a written statement from Napoleon in which he recanted his eyewitness identification of Jenkins as the shooter and stated that his identification was the product of police pressure. Both statements were prepared by one of the investigators and then signed by the witness.

On January 23, 2009, the § 440 court ordered an evidentiary hearing for the limited purpose of considering Gibson's recantation, holding Jenkins's remaining claims in abeyance. The hearing began on April 24, 2009. The investigator who took Gibson's statement testified about the interview and the methods he employed with Gibson. Gibson testified that he met with the investigators and signed a written statement prepared by them, but that half of the document was blank when he signed it. Although he did not read the statement carefully at the time of signing it, Gibson testified that the final document differed in several respects from the version he had signed, specifically indicating the new and/or differing language in the final statement. Gibson denied knowledge of two paragraphs in the statement that stated that Jenkins had never told Gibson that he was the shooter. Gibson testified that the paragraph was added at a later date, after he had signed the document. Gibson stated numerous times at the hearing that he had testified truthfully at Jenkins's trials.

On May 15, 2009, Jenkins filed a second supplemental memorandum of law in support of his § 440 motion. He claimed that, based on newly discovered evidence, his rights

under *Brady v. Maryland*, 373 U.S. 83 (1963), had been violated.   Jenkins had learned that

Gibson had made trips to court in connection with Jenkins's first and second trials.  He had also

learned that the prosecutor from Jenkins's second trial stated in an August 6, 2008 deposition

that there had been a witness in Jenkins's case who wanted to enter into a cooperation agreement

but was refused by the State.  This witness was imprisoned upstate and had been brought down

and interviewed by the prosecutor but not used at trial.  From these statements, Jenkins inferred

that Gibson, who at the time was imprisoned upstate, was the witness mentioned by the

prosecutor in her deposition and had refused to testify at the first two trials without an agreement

in place.

   The § 440 court issued three separate opinions denying all of Jenkins's claims.

   On August 10, 2009 the court denied Jenkins's arguments from his second

supplemental memorandum.  The court held that Jenkins had failed to show that the evidence

regarding Gibson's court trips and the prosecutor's deposition testimony was newly discovered

evidence.  Pet.'s Memo. of Law, Ex. 12.  It found that the court trips could have been discovered

with the exercise of due diligence and further that it was "highly unlikely" that the disclosure of

the meetings would have changed the outcome of the trial.  *Id.* at 3.  Additionally, the court

determined that "[t]here is no proof that the prosecutor and Sean Gibson ever reached an

understanding in which Gibson's cooperation was exchanged for any offer of leniency or any

other benefit granted by the prosecutor at any time prior to or during defendant's first two trials."

*Id.* at 4.  As such, the meetings did not produce exculpatory evidence constituting *Brady* material

and "would not likely have had an impact on the verdict."  *Id.*

   On September 18, 2009, the court denied Jenkins's claim that the trial court had

abused its discretion by denying his motion to present expert eyewitness-identification

testimony, finding that the claim was subject to a mandatory procedural bar because it had been decided on the merits on direct appeal. Pet.'s Memo. of Law, Ex. 13 at 12. The court also rejected Jenkins's argument that Napoleon's recantation constituted newly discovered evidence and further determined that the recantation was not credible. *Id.* at 13-18.

Finally, on September 29, 2009, the court found that "Sean Gibson did not recant his trial testimony in a written statement to two private investigators in July, 2008. Based on the hearing testimony, the alleged written recantation statement is unreliable and not worthy of belief." Pet.'s Memo. of Law, Ex. 14 at 7. The court described the investigator's "methods used to obtain the alleged written statement" as "extremely suspect and unusual":

> [I]nstead of asking Mr. Gibson about the incident directly, [the investigator] warned Mr. Gibson about possible federal court consequences before asking him anything . . . . [He] . . . told Mr. Gibson that when the Federal Court realizes it was lied to in 2001 and given perjured testimony, there would be serious consequences . . . federal courts do not like being lied to and a lot of people will be scrambling to save themselves.

*Id.* at 8. Based on the investigator's testimony, the court determined that the investigator's statements to Gibson "were obviously designed to coerce, scare, and intimidate Mr. Gibson in the hopes of obtaining a favorable statement." *Id.* The court also questioned the investigator's choice not to record the interview and to write out Gibson's statement himself. Given that the court found credible Gibson's testimony, "reaffirmed many times" during the hearing, that he had not recanted any of his trial testimony to the defense investigators, it denied Jenkins's § 440 motion.

G.     *The § 440 Appeal and Second § 440 Hearing*

On March 22, 2010, the Appellate Division, Second Department granted Jenkins leave to appeal the § 440 court's decisions. On May 31, 2011, the Appellate Division affirmed

the § 440 court's August 10, 2009 and September 29, 2009 orders. The Appellate Division reversed and remanded the part of the September 18, 2008 order related to Napoleon's recantation, finding that the lower court's determination was unwarranted in the absence of a hearing. *People v. Jenkins*, 84 A.D.3d 1403, 1407 (2d Dep't 2011).

A second § 440 hearing was held before a different court on various dates between September 2011 and January 2012. The investigator who took Napoleon's statement – the same one who took Gibson's statement – testified about his interactions with Napoleon. He made similar preliminary statements to Napoleon as he did to Gibson:

> I said federal courts don't like to be lied to. That this situation is going to viewed very gravely by the Federal District Court, and when something like that happens, when a series of lies begins to unravel in a court setting, the people who are responsible for those lies are going to try to save themselves at the expense of others, and you don't want to be one of the others.

Second § 440 Tr. (Oct. 31, 2011) at 210. The investigator related that in response to his opening lines and then to his questioning, Napoleon "was very quiet" and often "nodding." *Id.* at 210, 213. According to the investigator, Napoleon "wasn't saying anything really" until he began "bemoaning the fact that it hadn't gone away. He had hoped that this whole thing would be over and done with, and now here somebody was on his front step asking him questions . . . ." *Id.* Napoleon testified that he felt that he couldn't turn away the investigators who came to his door because he was on probation and believed one investigator to be a law enforcement official. He said that he felt threatened and signed the statement he was presented with because he wanted the investigators to leave. Napoleon reaffirmed his trial testimony that he saw Jenkins shoot Reese.

On October 24, 2012, the second § 440 court denied Jenkins's motion. The court found that Napoleon's recantation to the defense investigator "would have slight value at a new trial" given Napoleon's credibility in reaffirming his eyewitness testimony:

This Court had an opportunity to assess Napoleon's credibility at the hearing during extensive direct and cross-examination. I find that his testimony affirming the truthfulness of his trial testimony is credible, that the explanation he gave for the statements he made to [the investigator] is reasonable, and that his repudiation of the recantation is believable. It was undisputed that the investigators arrived without warning, entered his home, told him that the other witnesses had recanted and that the federal court would look very unkindly at perjured testimony, and advised him that he would be left "holding the ball." I credit Napoleon's testimony concerning the circumstances of his statements to [the investigator].

Pet.'s Memo. of Law, Ex. 18 at 7-8. The court further concluded that the recantation would be admissible only as a prior inconsistent statement at a future trial, which, because such evidence "merely impeaches," falls short of the standard for newly discovered evidence. *Id.* at 8. Moreover, the court noted the presence of "ample" evidence corroborating Napoleon's trial testimony, including Jenkins's admission to Gibson that he was the shooter. *Id.* at 8-9. Finally, the court dismissed Jenkins's argument that "the facts and circumstances surrounding the identification are highly suspect," finding that all such facts and circumstances were known to the jury, which evaluated them and assessed Napoleon's credibility before returning a guilty verdict after the fourth trial. *Id.* at 9.

On February 28, 2013, Jenkins filed an application for leave to appeal. The application was denied on September 4, 2013. Following the denial of his state court § 440 motion, Jenkins filed his first amended petition for a writ of habeas corpus in this court on February 28, 2014. I heard oral argument on August 14, 2014.

DISCUSSION

A.      *The Standards of Review*

        1.      *Exhaustion and Procedural Default*

        The exhaustion requirement, codified at 28 U.S.C. §§ 2254(b) and (c), obligates a federal habeas petitioner to exhaust state judicial remedies before seeking relief from a federal court. To exhaust state remedies, a petitioner must "fairly present" his federal constitutional claims to the highest state court with jurisdiction over them. *Duncan v. Henry*, 513 U.S. 364, 365 (1995) (internal quotation marks and alterations omitted); *Daye v. Attorney General of New York*, 696 F.2d 186, 191 (2d Cir. 1982) (*en banc*). This requirement, which "springs primarily from considerations of comity" between the federal and state systems, affords the state system the "opportunity to pass upon and correct alleged violations of its prisoners' federal rights." *Id*.

        2.      *AEDPA Deference to State Court Decisions and Findings of Fact*

        A federal habeas court may grant habeas relief "with respect to a[ ] claim that was adjudicated on the merits in State court proceedings" only if the state court's decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or "was based on an unreasonable determination of the facts in light of the evidence in the State court proceeding." 28 U.S.C. §§ 2254(d)(1)-(2).[2] In addition, a federal habeas court must presume all state court factual determinations to be correct, unless the petitioner rebuts the findings by clear and convincing evidence. *Id*. § 2254(e)(1). AEDPA's deferential review applies whenever a state court disposes of a state prisoner's federal claim on the merits, regardless of whether it gives reasons for its

---

[2]      This limitation on relief is frequently referred to as "AEDPA deference." *E.g.*, *Cullen v. Pinholster*, 131 S. Ct. 1388, 1410 (2011); *Berghuis v. Thompkins*, 560 U.S. 370, 390 (2010); *Miller-El v. Cockrell*, 537 U.S. 322, 341 (2003).

determination or refers to federal law in its decision. *See Harrington v. Richter*, 562 U.S. 86, 99-100 (2011); *Sellan v. Kuhlman*, 261 F.3d 303, 312 (2d Cir. 2001).

The Supreme Court has interpreted the phrase "clearly established Federal law" to mean "the holdings, as opposed to the dicta, of [the Supreme Court's] decisions as of the time of the relevant state-court decision." *Williams v. Taylor*, 529 U.S. 362, 412 (2000); *see also Gilchrist v. O'Keefe*, 260 F.3d 87, 93 (2d Cir. 2001). A decision is "contrary to" clearly established federal law if "the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts." *Williams*, 529 U.S. at 412-13. A decision is an "unreasonable application" of clearly established federal law if a state court "identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of [a] prisoner's case." *Id.* at 413. Elaborating on the "unreasonable application" standard, the Supreme Court has held that a habeas court may only "issue the writ in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with [the Supreme Court's] precedents." *Richter*, 131 S. Ct. at 786.

B.    *Jenkins's Claims for Relief*

Jenkins makes four arguments in support of his petition. He first raises two claims which he first raised on direct appeal: (1) the identification-hearing court's determination that Napoleon had an independent source to make his in-court identification of Jenkins as the shooter was contrary to, or an unreasonable application of, clearly established federal law; and (2) the state court's denial of Jenkins's motion to present expert testimony on eyewitness identification deprived him of due process. Jenkins next raises two claims that he raised in his §

440 motion:  (3) the state court's refusal to vacate Jenkins's conviction where the State failed to disclose *Brady* material related to Gibson's cooperativeness and willingness to testify, and its failure to correct Gibson's false testimony regarding his refusal to testify, were contrary to or an unreasonable application of clearly established federal law; and (4) the state court's refusal to vacate Jenkins's conviction in light of Napoleon's and Gibson's recantations deprived him of due process.

1.      *The Independent Source Hearing*

"When the defendant objects to identification testimony to be given by a witness who has identified him prior to trial, a sequential inquiry is required in order to determine whether either the prior identification or an in-court identification of the defendant at trial is admissible."  *Raheem v. Kelly*, 257 F.3d 122, 133 (2d Cir. 2001).  First, the court must determine whether the pre-trial identification procedure "unduly and unnecessarily suggested that the defendant was the perpetrator."  *Id.*  "Single-photo identifications are generally disfavored as unduly suggestive," and this case is no exception.  *United States v. Stanley*, No. 09-cr-0141 (NGG), 2009 WL 5066864, at *4 (E.D.N.Y. Dec. 22, 2009) (citing *United States v. Concepcion*, 983 F.2d 369, 377 (2d Cir. 1992)).  The Second Circuit "has consistently condemned the exhibition of a single photograph as a suggestive practice, and where no extenuating circumstances justify the procedure, as an unnecessarily suggestive one."  *Wiggins v. Greiner*, 132 F. App'x 861, 865 (2d Cir. 2005) (citation and internal quotation marks omitted).  The State has articulated no extenuating circumstances or other justification for the investigating police detective's use of a single-photo procedure with Napoleon as opposed to an alternate procedure, such as a photo array.  Indeed, Napoleon has alleged that the detective coached him to say that he had prior familiarity with Jenkins, which he did not have, in order to help establish that the

identification was independently reliable and therefore admissible. There is no question that the detective knew the identification procedure was improper. I conclude that the use of a single-photo display in this case was unnecessarily suggestive.

The next step of the inquiry is whether or not the challenged identification was "nonetheless independently reliable." *Raheem*, 257 F.3d at 133. "Whether an in-court identification has a source independent of an earlier tainted identification is a mixed question of law and fact." *Young v. Conway*, 698 F.3d 69, 77 (2d Cir. 2012), *cert. denied*, 134 S. Ct. 20 (2013) (citing *United States v. Wade*, 388 U.S. 218, 241-42 (1967)). "On federal habeas review, mixed questions of law and fact translate to 'mixed constitutional questions (*i.e.*, application of constitutional law to fact).'" *Id.* (quoting *Overton v. Newton*, 295 F.3d 270, 277 (2d Cir. 2002)). Under AEDPA, I must determine whether the state court's decision on the mixed constitutional question "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States.'" 28 U.S.C. § 2254(d)(1) (cited in *Young*, 698 F.3d at 77). The State bears the burden of proving by clear and convincing evidence that the in-court identification was based upon observations independent of the suggestive identification procedure. *See Young*, 698 F.3d at 78.

In determining whether a witness's in-court identification of a defendant has reliability independent of an unnecessarily suggestive identification procedure, a court looks generally to the factors set out in *Neil v. Biggers*: "[1] the opportunity of the witness to view the criminal at the time of the crime, [2] the witness' degree of attention, [3] the accuracy of the witness' prior description of the criminal, [4] the level of certainty demonstrated by the witness at the confrontation,[3] and [5] the length of time between the crime and the confrontation." 409

---

[3]      Courts have since recognized that there is little correlation between the certainty and reliability of the testifying witness. *See Young*, 698 F.3d at 87-89 (2d Cir. 2012). However, the law requires that the

U.S. 188, 199-200 (1972). "A good or poor rating with respect to any one of these factors will generally not be dispositive, and in each case, the question of independent reliability must be assessed in light of the totality of the circumstances." *Raheem,* 257 F.3d at 135 (citations omitted).

The state court held a hearing to determine whether Napoleon had an independent source for his in-court identification of Jenkins. I conclude that its finding that the State had proven the existence of an independent source by clear and convincing evidence was reasonable. First, based on the hearing testimony, the court determined that Napoleon had ample opportunity to view Jenkins during the shooting. The area was well lit from several sources, including the Rochdale Village complex, streetlights on Guy R. Brewer Boulevard, open stores and passing cars, and the light of the bus stop shelter near to where Reese was shot. The court further found that Napoleon was a reasonable distance away when observing Jenkins. He first noticed Jenkins as Jenkins moved toward the bus stop with his companions. He continued to observe them as they approached Reese. Napoleon's view was unobstructed as he watched Jenkins shoot Reese. Moreover, because Jenkins did not stand directly behind Reese, Napoleon saw Jenkins's face. He continued to observe Jenkins as Reese fell down and then, as Napoleon ran from the scene, he looked back and watched Jenkins shoot Reese as he lay on the ground. Napoleon saw Jenkins a final time as Jenkins fled back towards the well-lit complex.

Second, Napoleon was near the scene of the shooting to sell drugs, and as a result was on the look out in order to avoid being caught by the police. It would thus be reasonable to conclude that he was paying a high degree of attention to his surroundings. Third, throughout the long life of this case, including at the independent source hearing, Napoleon has maintained

---

reasonableness of a state law decision be determined in light of relevant Supreme Court holdings at the time of the last adjudication on the merits. *See Greene v. Fisher*, 132 S. Ct. 38, 44 (2011).

that he is certain that Jenkins is the man he saw on the night of the shooting. The third and fifth *Biggers* factors are not here indicators of reliability, but the other factors make the state court's finding of independent reliability reasonable. Although the decision could have gone the other way, as Jenkins argues at length based on opposing evidence, I conclude that the state court's decision cannot be characterized as unreasonable and thus I may not disturb it on habeas review.

2. *Expert Testimony*

On April 9, 2003, five months before his fourth trial, Jenkins moved in the state court for permission to call an expert on identification procedures. Specifically, the proposed expert testimony would relate to the "forgetting curve," how stress affects identification, the effect on a witness of repeated viewings in court, the "assimilation factor," and the disconnect between witness confidence and the reliability of the identification.

"The right to call witnesses in order to present a meaningful defense at a criminal trial is a fundamental constitutional right secured by both the Compulsory Process Clause of the Sixth Amendment and the Due Process Clause of the Fourteenth Amendment." *Washington v. Schriver*, 255 F.3d 45, 56 (2d Cir. 2001) (citations omitted) (noting that the line of cases regarding the fundamental right of an accused to present a defense "has been applied to the exclusion of expert witnesses"). "'Erroneous evidentiary rulings rarely rise to the level of harm to this fundamental constitutional right' to present a meaningful defense. Nevertheless, state evidentiary rules cannot be inflexibly applied in such a way as to violate fundamental fairness." *Id.* (quoting *Agard v. Portuondo*, 117 F.3d 696, 705 (2d Cir. 1997), *rev'd on other grounds*, 529 U.S. 61 (2000)).

Whether or not the exclusion of witness testimony rises to the level of a constitutional violation depends on whether "the omitted evidence evaluated in the context of the

entire record creates a reasonable doubt that did not otherwise exist." *Jones v. Stinson*, 229 F.3d 112, 120 (2d Cir. 2000) (alterations, internal quotation marks, and citations omitted).

The state court denied Jenkins's motion to call an expert, reasoning that there was other evidence in the case linking Jenkins to the crime, and the Appellate Division determined that the motion was properly denied. Separate and apart from the extra measure of deference required by AEDPA, I conclude that the trial court's decision was not an abuse of its broad discretion.

Napoleon's eyewitness testimony identifying Jenkins was bolstered by the testimony of three other witnesses at the fourth trial. Gibson, Morgan and Payne testified that Jenkins had made threats against Reese and asked for information about him after Reese beat up Jenkins's nephew. Gibson also testified that Jenkins had admitted shooting Reese. Though other judges might have decided the matter differently, it was well within the trial court's discretion to deny the motion for permission to call an expert witness.

Finally, the question on habeas review is not whether the decision prevented Jenkins from presenting his defense, but rather whether the state court's decision that it did not was unreasonable. It clearly was not.

3. Brady *Obligations*

Jenkins alleges that his rights were violated under *Brady* when the state failed to disclose information about Gibson's court trips and the State's back-and-forth on whether or not to call him as a witness and/or enter into a cooperation agreement with Gibson prior to the fourth trial. Jenkins contends that this evidence shows that Gibson was unwilling to testify without a cooperation agreement, information the defense could have used to undermine his credibility at trial.

> In order to establish a *Brady v. Maryland* violation, the defendant must show that (1) the government suppressed favorable evidence, and (2) the evidence the government suppressed was material. A defendant cannot satisfy the suppression requirement if the defendant, directly or through counsel, "either knew, or should have known, of the essential facts permitting him to take advantage of [that] evidence." As for the materiality requirement, "favorable evidence is material, and constitutional error results from its suppression by the government, if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." "A 'reasonable probability' is 'a probability sufficient to undermine confidence in the outcome' of the case."

*Lamberti v. United States*, 22 F. Supp. 2d 60, 66-67 (S.D.N.Y. 1998), *aff'd sub nom.*

*Badalamenti v. United States*, 201 F.3d 430 (2d Cir. 1999) (footnotes and citations omitted).

The state court's rejection of this claim was not unreasonable. First, defense counsel knew of the essential facts that would allow him to ascertain the information at issue. Indeed, counsel independently secured it at a later time. Moreover, the information was not material. Gibson had provided a written statement to the police about Jenkins's confession to him five days after the murder, well before his incentive to curry favor with the prosecutor arose. When he finally testified, his arrangement with the prosecutor, and the benefit he was to receive for his testimony, were fully and properly disclosed. The details of his dealings with the prosecutor prior to and during the first and second trials, in which he did not testify, were characterized by the Appellate Division as neither exculpatory nor material. That determination simply was not an unreasonable application of *Brady* and its progeny.[4]

---

[4] Jenkins also contends that the State's failure to correct Gibson's testimony regarding his absence as a witness at Jenkins's first two trials was contrary to clearly established federal law. *Brady* mandates that a prosecutor avoid soliciting false testimony, and also that he or she not allow it to go uncorrected. *See Perkins v. LeFevre*, 642 F.2d 37, 40 (2d Cir.1981). Gibson's testimony was not false. Though Jenkins has assumed that Gibson resolved not to testify until securing a benefit for himself, there is no proof of that proposition. As such, I decline to find that Gibson was untruthful when he testified during cross-examination that it was "not correct" that "only until and after [he] received a benefit . . . did [he] decide to testify." Pet.'s Memo. of Law, Ex. A at A3641:13-3642:16.

4.      *Newly Discovered Evidence*

Jenkins challenges the state court's refusal to vacate his conviction based on Napoleon's and Gibson's recantations.  However, the state court made detailed factual findings after a hearing crediting Napoleon's and Gibson's testimony.  I presume the truth of these determinations, and in light of the hearing testimony, I find them to be entirely reasonable.

## CONCLUSION

For the reasons stated above, Jenkins's petition is denied.  Because Jenkins has failed to make a substantial showing that he was denied a constitutional right, no certificate of appealability shall issue.

So ordered.

John Gleeson, U.S.D.J.

Dated:  April 24, 2015
        Brooklyn, New York